## MOELLER *v.* NOTTER.

ADVANCEMENT—GIFT—CONTRACTS—FAILURE OF CONSIDERATION.

Where plaintiff executed a writing setting up the fact that she had given to her daughter a portion of her maternal inheritance and that the daughter should pay interest on the amount during the lifetime of the giver, and it appeared from the testimony that it was later agreed between the parties that the mother should live at the daughter's house and should pay for her keep, and, that without sufficient reason, she later attempted to rescind the entire arrangement and brought suit to recover the nine hundred dollars advanced, in the absence of any evidence of fraud in bringing about the gift defendant was not liable on the theory of rescission and the trial court should have granted her motion to direct a verdict in her favor.

Error to Huron; Beach, J. Submitted November 22, 1914. (Docket No. 116.) Decided March 17, 1915.

Assumpsit by Fredrika Moeller against Lena M. Notter for the recovery back of money paid to the defendant. Judgment for plaintiff. Defendant brings error. Reversed.

*De Foe, Hall & Converse,* and *Paul Woodworth,* for appellant.

*Alfred H. Sauer* and *George M. Clark,* for appellee.

BROOKE, C. J. The plaintiff at the time this action was tried, in 1914, was 79 years of age. She was born and educated in Germany and could read and write the German language. She had lived in this country nearly 50 years and spoke English imperfectly. She married and settled down in Huron county at an early day and became the mother of five children (one son

and four daughters). With usual German thrift, she and her husband accumulated some little property, consisting principally of a farm in Huron county valued, at the time of her husband's death in 1905, at about $6,000. The husband appears to have died intestate. A settlement of the estate was arranged in some manner, as the result of which Henry, the son, took the homestead farm and gave to his mother a mortgage for $1,500 in payment of her interest therein. The defendant Lena M. Notter, one of the four daughters, took a 40-acre farm adjoining a farm Mrs. Notter at that time owned, and gave her mother a mortgage for $580. The record does not disclose what provision was made for the other three daughters in the division of the paternal estate. After the death of her husband, plaintiff continued to live on the homestead with her son some months, and until December, 1905. A few weeks prior to the last-named date, the defendant and one of her sisters petitioned the probate court for the appointment of a guardian for their mother, the plaintiff. The plaintiff, however, having concluded to make her home with the defendant, no hearing was had on this petition and the proceedings were allowed to lapse. At the time plaintiff went to live with defendant, her daughter, she was possessed of some notes, in addition to the mortgages already mentioned, so that at that time her entire estate amounted to upwards of $2,600. In the year 1907 plaintiff's son Henry filed another petition in the probate court for the appointment of a guardian for his mother, the plaintiff. A hearing was had on this petition and a guardianship was denied by the probate court. Upon the determination of this issue, plaintiff caused a will to be executed, by the terms of which she bequeathed to her daughter, the defendant, the sum of $900, and a like sum to another daughter. The other terms of the will are not disclosed, and are unimportant. Matters ran along with affairs in this

condition until February 24, 1909, a little more than three years after the date upon which plaintiff had taken up her residence with defendant. Upon that day the plaintiff wrote with her own hand and in German script the following statement:

"PIGEON, February 24, 1909.
"HURON COUNTY, MICH.
"A CERTIFICATE.

"I, mother, wife of Henry Moeller, give my legitimate, daughter from Henry Moeller, wife of Mathias Notter, give now while I live, her maternal inheritance $900.00, but she has to pay me interest for this money as long as I live.

"Then I give my son-in-law, Mathias Notter, 200. He has favored me often.

"Then I give my grandson, Lawrence Notter, $100. This I do of my own accord, nobody has moved or influenced me to do this.

"Have yet my full understanding.

"Signed and sealed this 24th day of February, 1909.
"FREDRIKA MOELLER.

"In presence of:
"ERNEST CLABUESCH.
"ABNER J. RAMSEYER."

Upon the same day she went with her grandson, a son of defendant Lawrence Notter, to the bank at Pigeon. She there asked Mr. Merrick to take her acknowledgment to the instrument, which he did, after some conversation with her, in the course of which she declared that she understood the meaning of the same and that it was her free act. Upon the same day she sold and assigned to the bank at Pigeon the $1,500 mortgage which she had up to that time held upon the homestead farm, receiving therefor the full sum of $1,500. This money she disposed of by giving to her daughter, the defendant, $900; to her son-in-law, defendant's husband, the sum of $200; to her grandson, Lawrence Notter, $100; and to her said grandson the further sum of $300, taking his indorsed promissory note therefor. Thereafter she continued

to live in the household of her daughter, the defendant, for nearly three years, or until January 2, 1912. During that period she made no complaint as to the treatment she received from the defendant or other members of her family, and none is disclosed by the record, with, perhaps, one or two insignificant exceptions. After leaving defendant's home in January, 1912, she lived for a time with her son Henry, and later with another daughter. Almost immediately after leaving she caused her declaration to be filed in this suit. In the first count of said declaration she charges that said $900 was procured from her by defendant through fraud. To this count is added the common counts in assumpsit.

Upon the trial she gave testimony tending to show that, after she had paid the $900 to her daughter, the defendant, her treatment had not been so good as formerly. When asked to specify the particulars in which she had been ill used, she charged that her daughter had latterly not taken her to church as frequently as formerly, that she had been asked to procure and use an individual drinking cup instead of the family dipper, and that, when her daughter became ill with rheumatism and a ruptured vein in her leg, she, the plaintiff, had been compelled to occupy a room upstairs instead of the one she had occupied upon the ground floor. Aside from these charges, which are apparently trivial in character, the record is silent as to any ill treatment of plaintiff by defendant. Upon the other hand, there is much testimony in the record given by neighbors and friends of the parties to the effect that plaintiff was well treated and was apparently happy and contented during the six years she remained under the roof of defendant. The court eliminated the question of fraud in his charge to the jury, saying:

"There was some skirmishing between the attorneys, when the trial was commenced, as to the legal aspects of the case as set out in the pleadings. On a

review of the pleading and what it was proposed to prove, the court cut out the question of fraud in this case, as a basis for any recovery, upon the character of the declaration as it was framed, and, after hearing the testimony, the court is confirmed in that theory. If I had permitted the question of fraud, I should have taken it away from you at this time, as a matter for recovery."

The case was, however, submitted to the jury under the following instructions:

"The issues in this case are these: The plaintiff asserts, and it is undisputed, that she paid over to Mrs. Notter $900. That, at the time the $900 was paid over, it was paid over with the understanding and agreement that Mrs. Moeller was to have a home with the Notters during her life. That that was the consideration for the giving of the $900 to Mrs. Notter. Plaintiff asserts, again, that the consideration has failed in this regard.

"In an agreement of that character, between relatives for support or maintenance or furnishing a home, the law implies and adds to the agreement a simple bare agreement, the fact that the care shall be a reasonable kind, suitable to the condition, age, situation, and characteristics of the party to be taken care of.

"It is the claim of the plaintiff that the agreement was violated by not furnishing care suitable to her condition and her age, and that she was warranted in leaving and attempting to recover back her money for a failure of consideration, want of consideration.

"The defendant asserts, in her behalf, that there was no agreement as a foundation or consideration for the payment of the money; but that it was advanced to her as her inheritance, apportioned out to her at that time in actual cash, as her share, or what the old lady intended to give her of her estate, without promise or agreement or any consideration to be returned for the same, simply given as a matter of love and affection, and as part of her coming inheritance, advanced and given to her at that (time) to avoid trouble in the future between the various heirs.

"Now, as a matter of law, a parent may make advancements to his children or her children, and if that is all there is of it, that it is simply advanced and so

regarded, that cannot be recovered back, simply because the parent may change her mind or change her state of kind (mind) and affections towards the party to whom it was given. It is a gift among relatives, and for a good consideration—affection. It cannot be recovered back.

"So those are the issues in this case, gentlemen. Was there an agreement at the time the money, preceding the payment, or at the time of giving the money over to Mrs. Notter, that she should have a home there during her life? If there was, has that agreement been violated in spirit and in substance as to the conduct of Mrs. Notter and the family towards Mrs. Moeller? If so, she is entitled to recover her money back. The phase the case has taken, the aspect it has taken, it is practically a rescinding of the contract. Defendant might have set off here, if she saw fit, against the claim, the proportionate value of her services to Mrs. Moeller, during the time she remained; but there is no claim of that kind in this case, and the matter stands practically as though no service had been rendered or claimed for on the part of the defendant.

"Now, as I say to you, the other question is: Was the money turned over simply as a gift by the mother to the daughter to give her her inheritance, anticipating her death and to avoid trouble? If so, it cannot be recovered back?"

At the close of all the testimony, defendant requested the court to charge the jury as follows:

"(1) Under the evidence in this case, your verdict should be for the defendant, no cause of action.

"(2) It appears from the undisputed evidence in this case that this $900 was given by the plaintiff to the defendant as a gift or advancement of her inheritance, and, in the absence of fraud of the defendant in procuring its payment, it is valid and binding on the plaintiff.

"(3) I charge you that there is no evidence in this case of fraud on the part of the defendant, inducing payment of this money.

"(4) Even though you should find an agreement on the part of defendant to provide plaintiff with a home, and there was subsequently a breach of con-

tract, there is no evidence of any damage suffered by plaintiff."

It was and is the claim of the defendant that the record contains no testimony to the effect that at, or immediately before, the time the $900 was paid by plaintiff to defendant, there was any conversation between plaintiff and defendant tending to establish a contract of any sort between them, and that therefore, instead of submitting this question of fact to the jury, the court should have directed a verdict in favor of defendant as requested to do.

On direct examination the plaintiff testified as follows:

"*Q.* Was there anything said by Mrs. Notter about where you should live after you have given her this money?

"*A.* She was to stay there with her.

"*Q.* Was there anything said about how she was to be treated after she gave them the money?

"*A.* She says that she thought they would use her good; instead, they were worse—unkind to her.

"*Q.* Was there anything said by Mrs. Notter as to how long you could live with her?

"*A.* She says no, she says that she wanted to go away at that time, and Mrs. Notter took her back in again when she was outside and told her to stay there.
\*   \*   \*

"*Q.* Before you gave Mrs. Notter the money, did you have a talk with her as to where you were to live and how you were to be treated after you gave her the money?

"*A.* She says she can't say.   \*   \*   \*

"*Q.* When did you have the talk with Mrs. Notter that you were to have the lower room?

"*A.* Right away after she came there."

On cross-examination plaintiff gave the following testimony:

"*Q.* And that was understood. You agreed about that before you went there to stay with Mrs. Notter; you talked about that?

"*A.* She says they kind of made out among them-

selves what they wanted to charge, and she says she was willing to pay whatever they asked.

"*Q.* And that was when you first went there?

"*A.* Yes, sir.

"*Q.* This talk about boarding with Mrs. Notter and paying your board was at the time you left Henry's and went to her house; that is when you talked about it?

"*A.* Yes, she said it was talked and understood.

"*Q.* And that was the time that Mrs. Notter told you you could live there as long as you wanted to?

"*A.* As long as I lived.

"*Q.* Now, you hadn't any other talk with Mrs. Notter about living there as long as you lived after that and before you got the money from the bank, had you; you didn't have any talk about that again, did you?

"*A.* She says no, she didn't have any talk; they didn't talk it over again; but she says she didn't want to stay any longer; they were rough to her."

Defendant and her son both testified that there was no conversation or contract entered into at the time of, or immediately before, the payment of the money. We think it clear, from a consideration of the plaintiff's testimony above quoted, and after a careful examination of the entire record, that there is no evidence in the record tending to show that at the time the money was paid any contract was entered into between the plaintiff and the defendant to the effect that the plaintiff should have a room with her daughter, the defendant, for the remainder of her life. However, an arrangement was entered into at the time plaintiff took up her residence with defendant. That arrangement was that plaintiff should pay for her board while living with defendant, and this she did from the moment she entered defendant's house until the day she left, and it was at that time doubtless understood and agreed that plaintiff should spend her remaining days with defendant.

Taking the testimony as a whole, and the situation of the parties as disclosed by the record, and giving proper weight to the declaration made by plaintiff in

her own handwriting and in a language which could not be read by either her grandson or the notary public who took her acknowledgment thereto, we are convinced that the payment of the $900 by the plaintiff to defendant was a gift *inter vivos*, or an advancement, made by the mother to her daughter exactly in consonance with the terms of a will she had made a year or two before. That this payment was made for the purpose of forestalling possible complications after her death, we have no doubt.

After the plaintiff left the residence of her daughter, the defendant, and fell under the influence of one or others of her children, this suit was launched.

We are of opinion that the motion for a directed verdict made at the close of the testimony should have been granted.

The judgment is reversed, and a new trial ordered.

McALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.